# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **GEORGE L. CAIN,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:07-CV-2191-RDP** |
| | } | |
| **PETE GEREN, SECRETARY,** | } | |
| **DEPARTMENT OF THE ARMY,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

This case is before the court on Defendant's Motion for Summary Judgment (Doc. #20), filed May 15, 2009.  On June 5, 2009, Plaintiff filed his Response Brief.  (Doc. #26).  On June 16, 2009, Defendant filed its Reply Brief.  (Doc. #31).  Accordingly, this matter is now properly under submission.  For the reasons set forth below, Defendant's Motion is due to be granted.

## I.    STATEMENT OF UNDISPUTED FACTS[1]

### A.    Background

Since 1993, Defendant has employed Plaintiff as a Management Analyst for Logistics Support Activity ("LOGSA") at its United States Army Material Command, Redstone Arsenal in Huntsville, Alabama.  (Def. Ex. 16 at 3).  Plaintiff is a black male.  (Compl. ¶ 2).  During the period relevant to this lawsuit, Plaintiff's immediate supervisor was Sara Matala, a white female, who served as Supervisory Management and Program Analyst in LOGSA's Support Services Division and Enterprise Integration Center.  (Def. Ex. 1 at 37:9-15; Compl. ¶ 5).  His second-line supervisor

---

[1]If facts are in dispute, they are stated in the manner most favorable to Plaintiff. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

was Richard Manley, a white male, who served as Business Management Officer and Chief of LOGSA's Enterprise Integration Center.  (Def. Ex. 2 at 10:15-16, 11:19-21).

**B.      Plaintiff's Prior EEO Activity**

On December 4, 2004, Plaintiff contacted an EEO counselor regarding alleged discrimination. (Pl. Ex. 24 at 1).  Plaintiff's complaint arose out of his non-selection for a temporary promotion to a Program Analyst position in the LOGSA Enterprise Integration Center.  (Def. Ex. 3 at 108-16; Def. Ex. 6 at 22; Pl. Ex. 24 at 2).  He applied for this position on or about October 13, 2004, but on November 4, 2004, Matala notified him that she had selected Maxine Goff, a white female, instead of him for the temporary position.  (Pl. Ex. 24 at 2).

On December 7, 2004, the EEO counselor issued to Plaintiff a memorandum detailing his rights and responsibilities attendant to the process.  (Def. Ex. 3 at 1).  On December 15, 2004, because of Plaintiff's designation, the EEO counselor issued to Matala a witness memorandum. (Def. Ex. 18 at 1).  In the memorandum, the EEO counselor informed Matala that "[a] complaint of discrimination [had] been filed against the Department of the Army wherein [she had] been identified as having knowledge concerning the matters alleged."  (Def. Ex. 18 at 1).  The witness memorandum did not specify who initiated the complaint.  (Def. Ex. 18).

On January 7, 2005, Plaintiff filed a formal complaint of discrimination against Defendant and echoed the allegations contained in his informal complaint.  (Pl. Ex. 12 at 1, 3).  On January 27, 2005, Plaintiff requested a formal investigation, and Defendant's Office of Complaint Investigations ("OCI") received the request on February 4, 2005.  (Pl. Ex. 13 at 1).  In response, OCI required Plaintiff to submit a list of witnesses.  (Pl. Ex. 13 at 1).  Plaintiff complied, and on February 8, 2005,

he identified, among others, Matala as a relevant witness.  (Pl. Ex. 14 at 2).  On December 14, 2005,

a final administrative hearing was held on Plaintiff's EEO complaint.  (Pl. Ex. 15).

## C.     Vacant GS-0343-13 Program Analyst Position

On February 28, 2005, Defendant announced an opening for the position of Program Analyst,

GS-0343-13.  (Def. Ex. 7 at 1).  According to the official job description, produced by the Civilian

Personnel Operations Center ("CPOC"), a Program Analyst is responsible for the following duties:

> (1) <u>Organizational Efficiency Studies (25%):</u> "Designs and conducts comprehensive studies where the boundaries are extremely broad and difficult to determine in advance.  The studies are to improve efficiency by identifying, proposing, and devising new organizational structures, realignment of functions, and/or staffing levels."

> (2) <u>Programs Effectiveness Surveys (10%):</u> "Designs and conducts management surveys and research projects, and/or studies; and provides advisory services of a wide variety of substantive issues, with extensive scope and impact throughout a complex organization(s) with interrelated processes and functions."

> (3) <u>Workforce Measurement (10%):</u> "Develops detailed plans (many without precedent and long-range) and directs or conducts comprehensive management studies dealing with work measurement, methods and procedures, engineered time standards, and/or benchmarking, to identify problems and propose solutions to improve production efficiency.  Boundaries of the studies are extremely broad and difficult to determine in advance – actual limits are developed as the study proceeds."

> (4) <u>Program Resource Analysis (10%):</u> "Provides complex substantive management support services in the areas of program cost analysis, annual/long range fiscal planning, and development of annual work-plan(s), for organizations whose operations are interrelated and unstable."

> (5) <u>Team Leader (25%):</u> "Distributes and balances the workload among employees in accordance with established work flow or job specialization and assures timely accomplishment of the assigned workload.  Keeps in touch with the status and progress of work, and

makes day-to-day adjustments in accordance with established priorities, obtaining assistance from the supervisor on problems that may arise, such as backlogs which cannot be disposed of promptly. Estimates and reports on expected time of completion of work, and maintains records of work accomplishments and time expended and prepares productions reports as requested.  Gives on-the-job training to new employees in accordance with established procedures and practices.  Maintains a current knowledge and answers questions of other employees on procedures, policies, directive, etc. and obtains needed information or decisions from supervisor on problems that come up.  Sees to working conditions such as seating, ventilation, lighting, safety, etc.   Approves leave for a few hours or for emergencies.  Informs employees of available services and employee activities.  Resolves simple informal complaints of employees and refers others to supervisor.  Reports to supervisor on performance, progress and training needs of employees, and on disciplinary problems.  Makes information suggestions to supervisor as requested concerning promotions, reassignments, recognition of outstanding performance, and personnel needs."

(6) <u>Force Analysis Studies (20%):</u> "Conducts force analysis studies for correlation with strategic plans, stated missions and functions and planned mission and/or function changes.  Makes evaluative analysis to reflect degrees of effectiveness, impact from policy/procedural changes, problem/potential problem areas, trends, deficiencies, and imbalances. Develops and recommends alternatives that will improve program performance, efficiency, effectiveness, and responsiveness. Evaluates workload trends to identify imbalances between in-house and contract capabilities relative to activity's responsibility to retain minimum organic mission essential capacity.  Applies an analytical interpretation of DA/AMC regulations and directives affecting assigned programs.  Researches, assembles, organizes, and analyzes program data and information.  Makes evaluative analyses of aspects of programs including objectives, policies, work operations and progress and resource estimates and utilization.   Develops and presents conclusions and recommendations based on analysis and evaluation to operating and managements officials for use in external reporting of program/project/task status; and insure efficiency, economy, and responsiveness of mission accomplishments. Consults with operating/management officials in the appraisal of achievements and in discussing problem/potential problem areas and recommended actions."

4

(7) "Performs other duties as assigned."

(Pl. Ex. 6.2). The Civilian Personnel Advisory Center ("CPAC"), based on the position description, developed a vacancy announcement. (Def. Ex. 5 at 48:11-49:1). The vacancy announcement described the position as entailing the following responsibilities:

> (1) "Designs and conducts comprehensive studies where the boundaries are extremely broad and difficult to determine in advance;"
>
> (2) "Develops detailed plans (many without precedent and long-range) and directs or conducts comprehensive management studies dealing with work measurement, methods and procedures, engineered time standards, and/or benchmarking, to identify problems and propose solutions to improve production efficiency;"
>
> (3) "Estimates and reports on expected time of completion of work, and maintains records of work accomplishments and time expended and prepares production reports as requested;"
>
> (4) "Gives on-the-job training to new employees in accordance with established procedures and practices;" and
>
> (5) "Resolves simple informal complaints of employees and refers others to supervisor."

(Def. Ex. 7 at 1).

Including Plaintiff and Peggy East,[2] eighteen individuals applied for the position through the required RESUMIX program. (Def. Ex. 8 at 2; Pl. Ex. 17 at 1). Although East is a white female, it is undisputed that both before and at the time of the promotion decision, Matala had never met East, and she was unaware of East's race. (Def. Ex. 1 at 40:1-5; Def. Ex. 5 at 185:16-18). The referral list, which named each applicant, included a breakdown by gender and race. (Def. Ex. 8 at

---

[2]From 1993 until 2004, East worked in Huntsville, Alabama at the Defense Information Systems Agency ("DISA"). (Def. Ex. 17 at 1). From early 2004 until the events precipitating this litigation, she worked in New York for the Directorate of Resource Management. (Def. Ex. 17 at 1).

4).  However, the referral list neither designated each applicant's classification nor matched gender classification with race classification – only aggregate statistics were noted.  (Def. Ex. 8 at 3).  In terms of gender, twelve males and six females applied.  (Def. Ex. 8 at 4).  In terms of race, three black individuals and fifteen white individuals applied.  (Def. Ex. 8 at 4).

**D.      Application Process**

Matala convened a panel of three employees to assist her with selecting an individual to fill the vacancy.  (Def. Ex. 4 at 1).  Defendant customarily uses panels for this purpose.  (Def. Ex. 10 at 116:17-20).  Although panels are customary, their use is discretionary: "Panels, *if used*, must include a minimum of three members."  (Pl. Ex. 6.2 at 6) (emphasis added).  According to Defendant's policy, "[t]he [panel] members must be at the same or higher permanent grade of the position being filled and knowledgeable of the position responsibilities.  The composition of the panel should include at least a minority, a female, and a non-minority."  (Pl. Ex. 17 at 1).

This particular panel consisted of the following individuals: (1) Ike Wilder, a black male, who served as a Division Chief within the Enterprise Integration Center; (2) Edward Jimenez, an Hispanic male, who served as a Division Chief for the Information Technology Division and chairperson for the panel; and (3) Jo Hammon, a white female, who served as IT Specialist in the Directorate of Information Management.  (Def. Ex. 9 at 88, 91; Def. Ex. 10 at 113, 116; Def. Ex. 11 at 134-35).  None of the panel members knew East prior to or during the hiring process and ultimate selection, (Def. Ex. 9 at 90; Def. Ex. 10 at 114; Def. Ex. 11 at 136), and nothing in the record suggests they knew her race.

The members were provided with a Selection Matrix to score the applicants' resumes.[3]  In particular, the panel considered (1) Evaluations of Experience; (2) Training; (3) Education; and (4) Awards.  (Def. Ex. 21).  Under the Evaluations of Experience heading, applicants were to be graded on seven Tasks:

(1)  "experience in developing new or revised organizations or structures, mission, redistribution of functions, manpower utilization, and major changes in procedures, policy, methods and practices;"

(2)  "experience in planning, developing, coordinating, and administering a Management Control Program;"

(3)  "skill in oral communication to present training, study findings, organizational reviews, etc.;"

(4)  "skill in written communication to prepare matrices, monthly status reports, policies, regulations, etc.;"

(5)  "proficient in the processing of personnel actions within MDCPDS, to include inputting RPAs, completing Gatekeeper checklists, printing NPAs, tracking actions, etc.;"

(6)  "provides advisory services to center management on organization structure, methods, and procedures;" and

(7)  "proficient in Project Management."

(Def. Ex. 21).  For each category (Training, Education, and Awards) and each constituent Task, the panel members were to evaluate the candidates' resumes and assign a score, from zero to four.  (Def. Ex. 5 at 78:22-79:10).  Accordingly, from each panel member, an applicant could receive anywhere between zero points and forty points during this phase of the process.  (Pl. Ex. 9).

For each constituent Task under the Evaluations of Experience heading, the points were assigned as follows: "4 Points – Expert in function.  Experience in all areas.  In-depth knowledge;" "3 points – Knows nearly all aspects of this element;" "2 Points – Know[s] many of the components

---

[3]Matala prepared these score matrices prior to announcing the vacancy or receiving the candidates' resumes. (Def. Ex. 4 at 1; Def. Ex. 5 at 54:22-55:1).  She forwarded a copy to the LOGSA Command Group, before announcing the vacancy, for review and approval.  (Def. Ex. 4 at 1).

of this element;" and "1 Point – Knows some of the components of this element.   Limited Experience."  (Pl. Ex. 9).  For Training, the points were assigned as follows: "4 Points – In excess of four weeks of related training;" "3 Points – Three-four weeks of related training;" "2 Points – Two-three weeks of related training;" and "1 Point – One-two week[s] of related training."  (Pl. Ex. 9).  For Education, the points were assigned as follows: "4 Points – Masters in a related field;" "3 Points – Bachelors degree in a related field;" "2 Points – Associate degree in a related field;" and "1 Point – Some or no higher education."  (Pl. Ex. 9).  Finally, for Awards, the points were assigned as follows: "4 Points – 4 annual related performance or honorary awards over last 5 years;" "3 Points – 3 annual related performance or honorary awards over last 5 years;" "2 Points – 2 annual related performance or honorary awards over last 5 years;" and "1 Point – 1 annual related performance or honorary award[] over last 5 years."  (Pl. Ex. 9).

Matala provided to each panel member instructions on how to evaluate the resumes as well as matrices to track the scoring.  (Def. Ex. 5 at 9:14-23).  Based on his resume, the panel awarded Plaintiff the following points.  First, Plaintiff received 31 points from Jimenez.[4]  (Def. Ex. 12 at 1).  Second, Plaintiff received 31 points from Wilder.[5]  (Def. Ex. 12 at 2).  Finally, Plaintiff received 29 points from Hammon.[6]  (Def. Ex. 12 at 3).  In total, therefore, Plaintiff earned 91 points.

---

[4] Plaintiff received (1) 4 points for Task One; (2) 0 points for Task Two; (3) 4 points for task three; (4) 4 points for Task Four; (5) 2 points for Task Five; (6) 4 points for Task Six; (7) 2 points for Task Seven; (8) 4 points for Training; (9) 3 points for Education; and (10) 4 points for Awards.  (Def. Ex. 12 at 1).

[5] Plaintiff received (1) 4 points for Task One; (2) 0 points for Task Two; (3) 4 points for Task Three; (4) 4 points for Task Four; (5) 2 points for Task Five; (6) 4 points for Task Six; (7) 2 points for Task Seven; (8) 4 points for Training; (9) 3 points for Education; and (10) 4 points for Awards.  (Def. Ex. 12 at 2).

[6] Plaintiff received (1) 4 points for Task One; (2) 0 points for Task Two; (3) 4 points for Task Three; (4) 4 points for Task Four; (5) 2 points for Task Five; (6) 4 points for Task Six; (7) 0 points for Task Seven; (8) 4 points for Training; (9) 3 points for education; and (10) 4 points for Awards.  (Def. Ex. 12 at 3).

Based on East's resume, the panel awarded her the following points. First, from Jimenez, East, like Plaintiff, received 31 points.[7] (Def. Ex. 12 at 1). Second, from Wilder, East received 30.[8] (Def. Ex. 12 at 2). Third, East, like Plaintiff, received 29 points from Hammon.[9] (Def. Ex. 12 at 3). In total, therefore, East earned 90 points (*i.e.*, one point less than Plaintiff).

Based on their scores during the resume review phase, Plaintiff and East, in addition to Clingerman, Reynolds, Thompson, and Hamilton, qualified for interviews. (Def. Ex. 13 at 1; Def. Ex. 5 at 65:15-17). Indeed, Defendant's internal policy requires an interview process prior to filling a GS-13 vacancy. (Def. Ex. 5 at 81:22-23). During the interview phase, the panel, still composed of Jimenez, Wilder, and Hammon, questioned the candidates in the following seven areas:

(1)    "What is your experience directly related to a personnel processing system, for example, MDCPDS?"

(2)    "What types of computer programs are you proficient in using, i.e., Word, PowerPoint, Excel, Access? And how have you used them?"

(3)    "Approximate the number of briefings you have given in the last 3 years. What are the normal audience size, makeup and usual topic? What was the outcome?"

(4)    "Describe the differences between a CPOC and CPAC and describe your experience working with each?"

(5)    "Describe your experience in leading complex tasks. State the task(s) and its scope, you[r] leadership role, and its outcome."

(6)    "What is your approach to conflict in the office environment?"

---

[7] East received (1) 4 points for Task One; (2) 4 points for Task Two; (3) 4 points for Task Three; (4) 4 points for Task Four; (5) 1 point for Task Five; (6) 4 points for Task Six; (7) 2 points for Task Seven; (8) 4 points for Training; (9) 3 points for Education; and (10) 1 point for Awards. (Def. Ex. 12 at 1).

[8] East received (1) 4 points for Task One; (2) 4 points for Task Two; (3) 4 points for Task Three; (4) 4 points for Task Four; (5) 0 points for Task Five; (6) 4 points for Task Six; (7) 2 points for Task Seven; (8) 4 points for Training; (9) 3 points for Education; and (10) 1 point for Awards. (Def. Ex. 12 at 2).

[9] East received (1) 4 points for Task One; (2) 4 points for Task Two; (3) 4 points for Task Three; (4) 4 points for Task Four; (5) 1 point for Task Five; (6) 4 points for Task Six; (7) 0 points for Task Seven; (8) 4 points for Training; (9) 3 points for Education; and (10) 1 point for Awards. (Def. Ex. 12 at 3).

(7)    "Outside of training and academics, what is the accomplishment you are most proud of?"

(Def. Ex. 14).  Matala developed these questions and reviewed them with the panel members to ensure that they understood the meaning of each question.  (Def. Ex. 5 at 56:11-15).  Based on the candidate's response, the panel members each allotted between zero and four points for perceived quality and completeness of the answer.

The panel conducted the interviews via telephone because not all candidates could attend an in-person meeting.  (Def. Ex. 4 at 2).  Although Matala listened to the candidates' responses to the questions, she did not ask questions and, instead, merely observed the process.  (Def. Ex. 5 at 68:2-8).  Each candidate had an opportunity at the conclusion of his or her interview to provide any additional information that he or she deemed relevant.  (Def. Ex. 5 at 70:5-8).

During this process, Plaintiff received (1) 27 points total from Jimenez; (2) 26.5 points total from Wilder; and (3) 27 points total from Hammon.  (Def. Ex. 14 at 1, 3, 5).  East, on the other hand, received (1) 28 points total from Jimenez; (2) 24 points total from Wilder; and (3) 26 points total from Hammon.  (Def. Ex. 14 at 2, 4, 6).  The other candidates interviewed – Clingerman, Reynolds, Thompson, and Hamilton – received, on average, 26.167, 16.833, 20.667, and 18.667 points respectively.  (Def. Ex. 13 at 1).

The panel members consolidated each candidate's scores and submitted this matrix to Matala.[10]  (Def. Ex. 13; Def. Ex. 5 at 210:14-211:1).  In the consolidated scoring, Plaintiff received

_____

[10]Under the consolidated approach, for pre-interview scoring, the panel members allotted to each candidate the higher score obtained when the panel members diverged.  For example, on Task Seven, Plaintiff received two points from Jimenez, two points from Wilder, and zero points from Hammon.  In the consolidated matrix, Plaintiff's Task Seven score is two.  Similarly, on Task Five, East received one point from Jimenez, zero points from Wilder, and one point from Hammon.  In the consolidated matrix, East's Task Five score is one.  For each applicant's interview score, the panel members averaged the individual's score.  For the interview, Plaintiff received 27 points from Jimenez, 26.5 points from Wilder, and 27 points from Hammon, for an averaged score of 26.833 points.  East received 26 points from Jimenez,

57.833 points total.  (Def. Ex. 13).  East received 56.333 points total (*i.e.*, 1.5 points less than

Plaintiff).  Clingerman received 56.167 points (*i.e.*, 1.667 points less than Plaintiff).  (Def. Ex. 13).

Reynolds received 48.833 points (*i.e.*, 9 points less than Plaintiff).  (Def. Ex. 13).  Thompson

received 47.667 points (*i.e.*, 10.167 points less than Plaintiff).  (Def. Ex. 13).  Hamilton received

45.667 points (*i.e.*, 12.167 points less than Plaintiff).  (Def. Ex. 13).  From these scores, Matala

concluded that Plaintiff, East, and Clingerman were the top three candidates for the position because

the difference between their scores was "statistically insignificant."  (Def. Ex. 15 at 1).

Although the panel assisted Matala by narrowing the field from eighteen candidates to three,

Matala ultimately decided which applicant would fill the vacancy.  (Def. Ex. 5 at 10:8-11; 17:8-12).

The panel members did not recommend a particular candidate, and Matala did not solicit from any

of them opinions or recommendations regarding the applicants.  (Def. Ex. 5 at 80:3-19).

E.     **Matala's Decision**

According to Matala, applicants close in rating, *i.e.*, within or around five points of one

another, require closer scrutiny and additional assessment.  (Def. Ex. 5 at 84:9-85:4).  Specifically,

because the top three candidates' consolidated scores were very close in range, Matala independently

reviewed each candidate's resume.  (Def. Ex. 5 at 12:11-15; 83:13-17).  Based on this assessment,

on May 19, 2005, Matala selected East instead of Plaintiff or Clingerman for the position.  (Def. Ex.

15).   According to Matala, the panel's "final assessment identified [Plaintiff], [East], and

[Clingerman] as the top three candidates for the advertised position.  The numerical differences in

the top three candidate[s'] scores were statistically insignificant (57.8, 56.3, and 56.2). . . . I selected

---

24 points from Wilder, and 26 points from Hammon, for an averaged score of 25.333 points.  Accordingly, under the
consolidated approach, the total point score reflects (1) the higher scores obtained pre-interview and (2) the averaged
score from the interview.

[East] from the panel['s] determined group of 'best qualified' applicants based on my evaluation of

the[ir] strength[s] and weaknesses . . . ."  (Def. Ex. 15 at 1).

In a Memorandum for Record, Matala documented her basis for selecting East instead of

Plaintiff or Clingerman.  Regarding Plaintiff, Matala noted:

> [Plaintiff] has 3 years experience as a Senior Transportation
> Supervisor and 14 years experience as a Management Analyst action
> officer.  His resume reflects his knowledge of Personnel Policy and
> Procedures, Manpower Utilization and expertise in processing
> personnel actions.  However, examples of his professional experience
> were not cited in his resume.  His leadership experience is with the
> [United States Army Reserves] where he provided guidance and
> counsel to subordinates on military protocol and customs.  He has
> experience in several automated programs but his experience in
> preparing and conducting briefings is limited to military training.  His
> depth and breadth of knowledge of additional support service
> functions is limited.  For instance, his resume did not speak to [Table
> of Distribution Allowances, or "TDA"] development, only tracking
> assigned personnel to an existing TDA document**.**  During the
> interview [Plaintiff] citied [sic] his military service as examples of his
> experience.

(Def. Ex. 15).  Regarding Clingerman, Matala observed:

> Mr. Clingerman has 12 years experience as a Management Analyst
> action officer, 5 years experience as a Logistics Program Analyst, and
> 21 years of experience as a Personnel Staff NCO where he was a
> personnel staffing supervisor and team lead.  His resume reflects his
> awareness and knowledge of Personnel Policy, Manpower Utilization
> and Personnel Management.  However, examples of his experience
> were not enunciated in his resume or during the interview.

(Def. Ex. 15).  Finally, Matala highlighted East's qualifications as compared to Plaintiff and

Clingerman:

> Ms. East has 16 months of supervisory experience as a Program
> Analyst, 11 years experience as a Management Analyst Team Lead
> and 9 years as a Management Analyst action officer.  As depicted in
> her resume, she has in-depth experience in conducting organizational

> studies such as Efficiency Reviews and Manpower Staffing Standards
> Studies both as an action officer and team lead. Her resume states she
> directed management of the Table of Distribution and Allowances
> (TDA), prepared Concept Plans, managed a Management Control
> Program, oversaw Interservice Support Agreements and minimally
> processed personnel actions; all missions of LOGSA Support
> Services Division. She is adept in automated programs and has a
> wide range of oral and written communication skills. Ms. East citied
> [sic] numerous supervisory and team lead examples in her civilian
> personnel career as proof of her experience.

(Def. Ex. 15).

On the same day, Matala filed a Referral List Candidate Selection, which summarily stated:

"I have selected Ms. Peggy East based on qualified panel members['] rating of identified tasks and

interviews." (Pl. Ex. 11). In this document, Matala did not engage in the same level of analysis as

she did for the Memorandum for Record. (Pl. Ex. 11; Def. Ex. 15).

**F.      Plaintiff's Lawsuit**

On December 4, 2007, Plaintiff filed this lawsuit against Defendant. (Compl. at 1). He

asserted Title VII claims of race and sex discrimination as well as retaliation. (Compl. at 2).

Specifically, Plaintiff alleged that, although "qualified for the position, [he] was not promoted and

a white, female was promoted over him, who was, objectively, less qualified." (Compl. at 2).

Plaintiff requested compensatory and punitive damages in addition to permanent injunctive relief.

(Compl. at 3).

**II.     SUMMARY JUDGMENT STANDARD**

Summary judgment is proper only when there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law. FED. R .CIV. P. 56©. All reasonable doubts

about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick*

*v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination.  *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).

Under the *McDonnell Douglas/Burdine* scheme, Plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination.  Once Plaintiff proves a *prima facie* case, the burden of production shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its employment decision.  Finally, if Defendant carries its burden, Plaintiff must *either* show that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision.  *McDonnell Douglas Corp.*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02.

## III.    DISCUSSION

14

Defendant has moved for summary judgment on all claims asserted by Plaintiff. Accordingly, the court will address Plaintiff's race and sex discrimination claims and his retaliation claim, in turn.  For the reasons stated below, the court finds Defendant's motion is due to be granted in full.

### A.      Plaintiff's *Prima Facie* Case of Race and Sex Discrimination

Although the *prima facie* case requirements are flexible and contextual, in a failure to promote case, Plaintiff must generally produce evidence that: (1) he belonged to a protected class; (2) he was qualified for and applied for a position; (3) despite qualification, he was rejected; and (4) the position was filled with an individual outside of the protected class.  *Springer v. Covergys Customer Mgmt. Group Inc.*, 509 F.3d 1344, 1348 n.2 (11th Cir. 2007) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802; *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005)); *see also Walker v. Mortham*, 158 F.3d 1177, 1193 (11th Cir. 1998) (holding that "[a]lthough a plaintiff may be forced to address relative qualification if the defendant presents them to rebut the plaintiff's presumption of discrimination, the plaintiff need not introduce evidence regarding relative qualifications before then; [he] need only prove that [he] was qualified to perform the coveted job").

In the context of sex discrimination, Defendant has not contested Plaintiff's ability to make out a *prima facie* case.  Rather, Defendant limits its *prima facie* case argument only to Plaintiff's race discrimination claim.  Defendant argues that Plaintiff is unable to get off the start line with respect to his race discrimination claim because Matala, although aware of Plaintiff's race, was unaware of East's race at the time she made the hiring decision.[11]  Of course, it is axiomatic that

---

[11] During the course of discovery, Defendant admitted that (1) Plaintiff "applied and was qualified for the job Program Analyst, GS-0343-13[,] for which [Defendant] was seeking applicants" and (2) "despite [Plaintiff's] qualifications, he was rejected." (Pl. Ex. 35 at 2).  Similarly, Plaintiff's protected class membership is not in doubt.  (Pl.

"[a]n employer cannot intentionally discriminate against a job applicant based on race unless the employer knows the applicant's race." *Robinson v. Adams*, 847 F.2d 1315, 1316 (9th Cir. 1987). This case, however, presents an altogether different issue. There is no dispute that Defendant, through Matala, was aware of Plaintiff's race; however, there is nothing in the Rule 56 record to suggest that she was aware of East's race at the time of the promotion decision. Indeed, she has stated she was not. Accordingly, the issue here is whether in the failure to promote context, knowledge of the claimant's race but ignorance of the incumbent's race is sufficient to make out a *prima facie* case of race discrimination.

Defendant argues that it is not and, in support of that position, relies on *Lubetsky v. Applied Card Systems, Inc.*, 296 F.3d 1301 (11th Cir. 2002). In *Lubetsky*, the plaintiff sued a prospective employer for rescinding a job offer allegedly because of religious discrimination. 296 F.3d at 1303-04. The evidence indicated that the decision-maker had been unaware of the plaintiff's religion at the time of decision. *Id.* at 1306. The Eleventh Circuit, affirming the district court's grant of summary judgment, held that:

> where intentional religious discrimination under Title VII is alleged, a *prima facie* case is established if the plaintiff demonstrates the challenged employment decision was made by someone who was aware of the plaintiff's religion. Accordingly, an employer cannot intentionally discriminate against an individual based on his religion unless the employer knows the individual's religion.

*Id.* at 1305-06 (citations omitted). Similarly, in the race discrimination context, Defendant cites to *Washington v. Chao*, in which the court concluded that, if a defendant is unaware of the plaintiff's

---

Ex. 35 at 2).

16

race, then that failure of proof "vitiates any inference that [the plaintiff's] non-selection was based on his race."  577 F. Supp. 2d 27, 41 (D.D.C. 2008).

These cases do not help Defendant.  They stand for the unremarkable proposition that, when the decision-maker lacks knowledge of a plaintiff's protected status (as opposed to the incumbent's protected status), a Title VII discrimination claim is defeated as a matter of law.  Although in this case East is white, and therefore outside of Plaintiff's protected class, Matala, at the time of the employment decision knew of Plaintiff's race.  These cases, therefore, do not control here.

Plaintiff presents both a legal and factual argument to suggest that Matala was in fact aware of East's race.  First, from a legal standpoint, Plaintiff cites to *Carter v. Decisione Corp.*, 122 F.3d 997 (11th Cir. 1997), to suggest that the surrounding facts are sufficient to infer that Matala knew East's actual race.  In *Carter*, an age discrimination case, the Eleventh Circuit concluded that there was sufficient circumstantial evidence to support a jury's verdict against the defendant.  122 F.3d at 1003.  In particular, after observing that "there is no requirement that the decisionmaker in an age discrimination case know that the employee is over forty," the court explained that "the decisionmaker . . . had access to [the plaintiff's] personnel file and, on the day he informed [the plaintiff] she was being terminated, he gave her a ring commemorating her twenty years of service with the company.  Also, [the decisionmaker] discussed the fact that [the plaintiff] might file an age discrimination complaint with the other decisionmaker . . . ."  *Id.*  These facts were sufficient to support an inference that the decision-maker in *Carter* was aware of the plaintiff's age.  They also are distinguishable from the facts here.

In addition, *Carter* is inapposite for a wholly separate reason:  it is well settled that once a discrimination case proceeds to jury trial, *McDonnell Douglas* burden shifting is no longer an issue,

and the question is whether Plaintiff can prove discrimination *vel non*.  *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714-15 (1983); *Tidwell v. Carter Prods.*, 135 F.3d 1422, 1426 n.1 (11th Cir.1998) ("Our task is not to revisit whether the plaintiff below successfully established a *prima facie* case of discrimination . . . . [T]he question of whether the plaintiff properly made out a *prima facie* case is no longer relevant."); *Combs v. Plantation Patterns, Meadowcraft, Inc.*, 106 F.3d 1519, 1539 n.11 (11th Cir.1997) (because a full trial on the merits had been held, "the question of whether Combs properly made out a *prima facie* case is no longer relevant" (quotation omitted)); *Richardson v. Leeds Police Dep't*, 71 F.3d 801, 806 (11th Cir.1995) (per curiam) ("Richardson argues on appeal that the district court erred by visiting whether he had established a *prima facie* case of discrimination after the action was fully tried on the merits, in violation of [*Aikens*].  We agree that it was wrong for the court to follow this procedure.").  Therefore, Plaintiff's legal argument on this issue (*i.e.*, his reliance on *Carter*) holds no water.

Second, Plaintiff identifies the following facts as the basis for his argument that Matala knew East's actual race: (1) Matala had access to computer files that identified East's race; and (2) both Matala and East worked in Huntsville, Alabama from 1993 until 2004.  (Pl. Opp. Brief at 9-10).[12] First, even if Matala had accessed East's personnel file prior to the decision, because of an inputting error preceding the events of this lawsuit, the file indicated that East was black – not white.  (Pl. Ex. 3).  Crediting Plaintiff with the inference that Matala accessed the files would sound the death knell

---

[12]Additionally, Plaintiff notes that Matala (1) attended the telephonic interviews and listened to the applicants speak and (2) knew East's name prior to making the promotion decision.  (Pl. Opp. Brief at 9).  Presumably, Plaintiff relies on this evidence to suggest that Matala was aware of East's sex, instead of her race, before the promotion.  To be sure, the court is unable to determine that an individual could infer the race of another based on voice and name alone. In any event, Defendant has not argued, nor could it credibly argue, that Matala was unaware of East's sex.  Accordingly, although the court concludes that the circumstantial evidence is insufficient to warrant an inference of knowledge regarding East's race, it is more than reasonable to reach the contrary conclusion as to Matala's knowledge of East's sex.

for his Title VII race claim because there is no actionable race discrimination when the decision-maker perceives the incumbent and the claimant as being the same race. *See Howard v. Roadway Express, Inc.*, 726 F.2d 1529, 1535 n.4 (11th Cir. 1984). Second, as to their contemporaneous presence in Huntsville, East's employer was the Defense Information Systems Agency, but during that period, Matala's employer was the Redstone Arsenal. (Pl. Ex. 19; Def. Ex. 17 at 1). Aside from their presence in the same city and during the same time period, no evidence in the Rule 56 record suggests that East and Matala knew one another, interacted with one another, worked together, or otherwise were aware of each other prior to the employment decision in question. As the Western District of Michigan has persuasively explained:

> Circumstantial evidence – such as the fact that decisionmakers had access to information about a plaintiff's race through prior employment records or references on the resume – may raise a genuine issue of fact on the question. Nevertheless, plaintiff must provide some factual basis to support *a legitimate inference* that defendant was aware of plaintiff's race at the time it was making the decision in question.

*Copeland v. Delphi E&E*, No. 01-01, 2002 U.S. Dist. LEXIS 11906, at *11 (W.D. Mich. June 27, 2002) (internal citation omitted) (emphasis added). In this case, there is no basis under Rule 56 to extrapolate from mere contemporaneous presence in the same city that Matala and East interacted and Matala, therefore, was aware of East's race. Absent some additional evidence of interaction, circumstantial or otherwise, Plaintiff's suggested inference is unreasonable.

The cases considering disparate treatment in the promotion context generally fall into two camps: either an employer has conducted race-blind promotion processes, *e.g.*, *King v. Publix Supermarkets, Inc.*, No. 05-486, 2006 U.S. Dist. LEXIS 56537, at *12-14 (N.D. Ga. May 26, 2006), or an employer has been aware of the races of all applicants, *e.g.*, *Lett v. Reliable Ruskin*, No. 05-

19

479, 2006 U.S. Dist. LEXIS 50541, at *3-5 (M.D. Ala. July 24, 2006). This case, however, presents a slightly different situation. Matala, as selecting official, was aware of Plaintiff's race but unaware of East's race. The court concludes that, based on the facts of this case, Plaintiff has made out a *prima facie* case of race discrimination.[13] The following considerations counsel in favor of this conclusion.

In Title VII race discrimination cases generally, the foundational question is whether an employer took a particular action with respect to a particular employee because of that employee's race. In the promotion context, there is no racial discrimination as a matter of law when (1) the races of both the incumbent and the aggrieved claimant were known to the employer at the time of the promotion *and* (2) both the incumbent and the aggrieved claimant were the same race. *See, e.g.*, *Howard*, 726 F.2d at 1535 n.4 (noting that it is "implausible, if not logically impossible, for the [promotion] decision to have been racially discriminatory" when both applicants were the same race). Defendant has not cited any authority for the proposition that the presence of one, but not both, of these conditions precludes an inference of discrimination.

As the Eleventh Circuit has clarified, "Title VII does not 'give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group.'" *Nix*, 738 F.2d at 1186 (quoting *Connecticut v. Teal*, 457 U.S. 440, 455 (1982)). Instead, the goal of Title VII is "the protection of the individual employee, rather than the protection of the minority group as a whole." *Teal*, 457 U.S. at 453-54. These observations reflect that, although racial preference is one type of illegal discrimination, Title VII

---

[13] Even if the court did not reach this conclusion, it would assume without deciding that Plaintiff has established a *prima facie* case.

similarly proscribes adverse employment actions that are motivated by racial aversion and aimed at a single employee.  The former involves differential treatment through expressed employment preference.  The latter involves subjecting an employee to an adverse employment action because of his race.  The usual example in this type of case involves not hiring a qualified applicant yet the position remains open.  *See, e.g.*, *Welborn v. Reynolds Metals Co.*, 810 F.2d 1026, 1028 (11th Cir. 1987) (citation omitted).   Importantly, the presence of a comparator is highly probative of discriminatory motive, but it does not necessarily follow that the absence altogether eliminates an inference of discrimination.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004) ("If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present.") (citation omitted).

At bottom, therefore, the *prima facie* case's purpose is to raise "an inference of discrimination only because . . . these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Constr. Corp. v. Water*, 438 U.S. 567, 577 (1978) (citation omitted).  In other words, the *prima facie* case should not be applied mechanistically – it merely distills typically relevant considerations.  *Underwood v. Perry County Comm'n*, 452 F.3d 1258, 1259 (11th Cir. 2006) ("It is well-settled that the *prima facie* case method established by *McDonnell Douglas* was never intended to be rigid, mechanized, or ritualistic.  Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.") (citations and internal quotation marks omitted).

Turning to the facts of this case, whether the employer preferred East because of her unspecified race is marginally relevant to the inquiry.  The simple fact that Matala selected East, whose race was unknown, instead of Plaintiff, whose race was known, does not foreclose the

possibility that she opted *against* Plaintiff on account of his race.  This is true particularly in light of (1) the low percentage of non-white applicants in the pool of candidates (*i.e.*, three candidates, including Plaintiff, were black as compared to the fifteen white candidates) and (2) Plaintiff being at least minimally qualified for the position (which Defendant has conceded).  It is not unreasonable to infer from facts like these that a hiring employee, expressing racial aversion to an applicant, promoted someone else (even if that person's race is unknown) instead because the risk of fortuitously promoting another black employee was very low.

The court, therefore, concludes that Plaintiff has made out a *prima facie* case of race discrimination.  Nevertheless, on the spectrum of possible inferences, Plaintiff's inference of race discrimination is weak.[14]

## B.   Defendant Has Proffered Legitimate, Non-Discriminatory and Non-Retaliatory Justifications for Promoting East over Plaintiff or Clingerman

Once a plaintiff has demonstrated a *prima facie* case of discrimination, the burden then shifts to the defendant, who must articulate a legitimate, non-discriminatory reason for the allegedly discriminatory actions.  *McDonnell Douglas Corp.*, 411 U.S. at 802.  The same standard applies in the context of Title VII retaliation claims.  *See, e.g.*, *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).  Assuming that Plaintiff has made out a *prima facie* case of discrimination and/or retaliation, Defendant has shouldered its burden of advancing legitimate, non-discriminatory and non-retaliatory reasons for promoting East over Plaintiff and Clingerman.

Under the consolidated scoring approach, from the panel members, Plaintiff received 57.833 points, East received 56.333 points, and Clingerman received 56.167 points.  (Def. Ex. 13).  Matala

---

[14] If Matala had known East's race at the time of the selection, then obviously a stronger inference of race discrimination would be present.

had never had a panel ranking with scores so close to one another.  (Def. Ex. 5 at 83:23-84:2).

Because of the "statistically insignificant" disparity between Plaintiff's, East's, and Clingerman's

scores, Matala independently reviewed their respective resumes as part of her final assessment. (Def.

Ex. 15).  Despite the use of a panel to reduce the field of applicants, Matala felt equipped to engage

in such a review because, as the "selecting official[, she had] full knowledge of what the job

involve[d]."  (Def. Ex. 5 at 83:14-15).

     First, Matala promoted East over Plaintiff and Clingerman because of East's Team Lead

experience.  (Def. Initial Brief at 24).  According to Matala, "East has 16 months of supervisory

experience as a Program Analyst, 11 years experience as a Management Team Lead and 9 years as

a Management Analyst action officer."  (Def. Ex. 15).  Similarly, East had "numerous supervisory

and team lead examples in her civilian personnel career as proof of her experience." (Def. Ex. 15).

East reflected this experience in her resume.  (Def. Ex. 17 at 1).  She specifically noted that she

supervised two employees as a Supervisory Program Analyst and served as a Management Analyst

Team Lead over six people.  (Def. Ex. 17 at 1).  Her leadership experience was exclusively in the

civilian employee sector.  (Def. Ex. 17 at 1).

     In Plaintiff's resume, on the other hand, he indicated that he had three to four years of

leadership experience as a Senior Transportation Supervisor in his reserve military capacity.  (Def.

Ex. 16 at 4).  He had not supervised or served as a team lead over any civilian employees.  (Def. Ex.

16).  In fact, as he stated in his resume, Plaintiff's principal duty as Senior Transportation Supervisor

involved "executing established policies and standards pertaining to the performance, care, conduct,

appearance, personnel management, and training *of soldiers*."  (Def. Ex. 16 at 4) (emphasis added).

23

Plaintiff did not specify the number of soldiers whom he supervised in this capacity.  (Def. Ex. 16 at 4).

According to the Program Analyst job description, serving as Team Lead accounts for 25% of the position's responsibilities.  (Pl. Ex. 6.2 at 1).  Matala's consideration of team lead experience, therefore, was directly related to the position to be filled.  Although both applicants expressed a degree of supervisory and team lead experience, Matala preferred East's experience over that of Plaintiff and Clingerman.  The Program Analyst oversees primarily civilian personnel.  (Def. Ex. 5 at 157:5-161:22).  East, unlike Plaintiff, exhibited demonstrable civilian supervisory and team lead experience.  (Def. Ex. 16; Def. Ex. 17).  East served in a supervisory or team lead capacity for a substantially longer period than Plaintiff.  (Def. Ex. 16 at 4; Def. Ex. 17 at 1).  In particular, to the extent that Matala considered Plaintiff's experience, he indicated, on his resume, that he had served as Senior Transportation Supervisor since 2001, but in that position, he did not supervise civilian employees.  (Def. Ex. 16 at 4).  East, on the other hand, had over a decade of documented supervisory or team lead experience in the civilian arena.  (Def. Ex. 17 at 1).  A preference for germane experience, as opposed to training, is a reasonable, non-discriminatory and non-retaliatory justification for taking an employment action.

Second, Matala promoted East over Plaintiff and Clingerman because East articulated, using specific examples, the depth of her experience.  (Def. Initial Brief at 26).  According to Matala, East's "resume states she directed management of the Table of Distribution Allowances (TDA), prepared Concept Plans, managed a Management Control Program, oversaw Interservice Support Agreements and minimally processed personnel actions; all missions of LOGSA Support Services Division."  (Def. Ex. 15).  In Plaintiff's resume, however, "examples of his professional experience

24

were not cited . . . ." (Def. Ex. 15).  Similarly, in Clingerman's resume, "examples of his experience

were not enunciated . . . or [made apparent] during the interview."  (Def. Ex. 15).

Indeed, Matala's observation is born out by a review of East's resume.  For example, East

detailed the following professional accomplishments:

- "Oversee Table of Distribution and Allowances (TDA) management."
- "As the Installation Management Control Program (MCP) administrator, researches changes in the MCP program, provides guidance to organizations, reviews MCP input, compiles [sic] and prepares for Garrison Commander signature, and provided MCP training."
- "DRM representative on Transformation Team meetings to prepare for an additional 5000 soldiers at Fort Drum.  The Transformation Team reviews building requirements, infrastructure requirements and the impact and availability of funding."
- "Prepared manpower utilization and requirement brief that documented historical usage and projected future requirements for the Garrison Commander to present higher headquarters."
- "Team Leader for 6-person team reviewing resource/financial management in 18 DISA organizations; study showed a trend that resources could be reduced 30%.  Used benchmark and correlation and regression to compare organization resources.  Analyzed grades and series performing work.  Provided guidance/assistance to other analysts, monitored timelines, established suspenses, provided feedback to upper management on study status, compiled a final report, and out briefed the study results."
- "Helped develop an Activity Based Costing (ABC) model by identifying activities, activity costs, cost drivers, collecting activity data and calculating resource allocation."
- Interviewed work center personnel, reviewed workload data, developed equations to predict manpower, documented manpower for Tables of Distribution and Allowance (TDAs) and prepared written reports.  Presented written and oral briefings of study results to management (from branch chief to the SES level)."

(Def. Ex. 17 at 1).  Matala considered East's Management Control Program ("MCP") experience to

be particularly relevant and impressive.[15]  (Def. Ex. 15).

Plaintiff, on the other hand, merely listed, in active tense verbs, the generic duties entailed

with each position.  For example, he indicated that he performed the following functions:

- "Serves as a Management Analyst with responsibilities for analyzing, evaluating, developing and promoting the Logistics Support Activity organizational structure, mission, and functions and civilian military manpower resources programs."
- "Initiates and performs complex analyses, studies and surveys of LOGSA organizational alignments, mission assignments and manpower allocations.  Analyses [sic], studies and surveys involve broad areas that cross LOGSA organizational and functional lines."
- "Interviews operating and supervisory personnel and conducts research of records, reports, functional statements, operating regulations and directives and other pertinent data sources to gather, correlate, analyze, determine and recommend the necessary action to resolve management problems or improve the efficiency or economy of operations."
- "Interprets requirements, establishes parameters, gathers, reviews, and prepares pertinent information for reports and analyses.  Identifies criteria to measure attainment of goals and objectives and monitors and evaluates program effectiveness."
- "Develops and maintain[s] an automated system to track assignments of LOGSA civilian personnel against TDA authorizations and reports."
- "Determines the minimum essential number of military and civilian personnel required to perform valid functions effectively without regard to manpower celling and funding limitations for assigned organization."
- "Conducts within the full management analysis realm, management project studies of missions, organizations, work measurement, functions, work processes, methods, procedure, and other related criteria to clarify, appraise, refine, alter, or

---

[15]The panel members' evaluation correlated with this assessment.  Each panel member awarded four points to East for her MCP experience, whereas they each awarded zero points to Plaintiff.  (Def. Ex. 12 at 1-3).

improve present management applications and practices
within the various segments of the activity."

(Def. Ex. 16 at 1-3).

According to Matala, she "could see clearly the experience [East] had. She cited specific examples with studies she had conducted." (Def. Ex. 5 at 144:6-9). Conversely, Plaintiff failed to specify the particular work involved with his overarching job responsibilities. (Def. Ex. 5 at 99:10-100:5). In the final count, the concrete reflection of East's experience over Plaintiff's generic description of duties was another factor that tipped the scale in favor of East. (Def. Ex. 15). It is not unreasonable for an employer, motivated by non-discriminatory and non-retaliatory reasons, to prefer a candidate who documents his or her experience with specificity instead of parroting unadorned job descriptions.

**C.    Plaintiff Has Failed to Suggest that Defendant's Legitimate, Non-Discriminatory and Non-Retaliatory Reasons for Promoting East over Plaintiff or Clingerman are Pretext**

"If the employer satisfies its burden by articulating one or more [legitimate, non-discriminatory or non-retaliatory] reasons, then the presumption of discrimination [or retaliation] is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is pretext for illegal discrimination [or retaliation]." *Wilson*, 376 F.3d at 1087 (citing *Burdine*, 450 U.S. at 255-56); *see also Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006) ("To avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination.") (quoting *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993)).

To establish pretext, Plaintiff must reveal "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [Defendant's] proffered legitimate reasons for its actions that a

27

reasonable factfinder could find them unworthy of credence.  However, a reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Springer*, 509 F.3d at 1348-49 (citations and internal quotation marks omitted).  In the promotion context, the Eleventh Circuit has emphasized that "a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [person] who received the position he coveted.  A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by [the plaintiff's protected class or activity]." *Id.* at 1349 (citation and internal quotation marks omitted).  Additionally, and critical to this case, "a plaintiff must show that the disparities between the successful applicant's and his own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Id.* (citations and internal quotation marks omitted).[16]  For the following reasons, the court concludes that Plaintiff has failed to meet this burden.

1.    OCI Investigator Thaddeus Johnson's Conclusory Assertion that Defendant's Justification is "Suspect" is Insufficient Evidence of Pretext

In light of Defendant's non-discriminatory and non-retaliatory justifications, Plaintiff attempts to create a genuine issue of material fact by relying on OCI Investigator Thaddius Johnson's conclusions: "Management denies that the actions at issue were motivated or influenced by [Plaintiff's] race, gender, age, or reprisal. . . . Management's reasons for [its] actions concerning the

---

[16]Alternatively, if Plaintiff is unable to meet this standard, he "may create an inference of discrimination by showing that an employer promoted a person who did not meet the minimum qualifications for a job.  However, the fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination." *Wise v. Overhead Door Corp.*, No. 04-2972, 2006 U.S. Dist. LEXIS 13026, at *42 (N.D. Ga. Jan. 17, 2006) (citations and internal quotation marks omitted).  In this case, however, Plaintiff has not argued that East was unqualified to be Program Analyst – only that he was more qualified.

matter at issue are suspect." (Pl. Ex. 16). As a general rule, however, investigative reports, which state ultimate issues – such as finding discrimination or pretext – in a conclusory fashion and without factual basis, are insufficient to defeat a motion for summary judgment. *See, e.g.*, *Goldberg v. B. Green & Co., Inc.*, 826 F.2d 845, 848 (4th Cir. 1988) ("The Commission's report merely repeats facts which [the plaintiff] himself alleges elsewhere in this case, and then states in conclusory fashion that those facts reflect age discrimination. Such findings, standing alone, are not enough to salvage [the plaintiff's] claim."); *see also Mondero v. Salt River Project*, 400 F.3d 1207, 1215 (9th Cir. 2005) ("The fact that a determination from the EEOC is highly probative, however, does not support [the plaintiff's] contention that an EEOC determination letter is somehow a free pass through summary judgment."); *Horn v. Univ. of Minn.*, 362 F.3d 1042, 1045 (8th Cir. 2004) (noting that EEOC probable cause reports do not satisfy a plaintiff's burden of production at the summary judgment stage); *Smith v. Ala. Dep't of Corr.*, 145 F. Supp. 2d 1291, 1298 n.4 (M.D. Ala. 2001) (Albritton, J.) ("The court cannot conclude, therefore, that the conclusory statement by the EEOC investigator is sufficient to create a question of fact.") (citing *Bennett v. Parker*, 898 F.2d 1530, 1534 (11th Cir. 1990)). That is exactly what is involved here. Investigator Johnson's *unsworn* declaration does not provide any basis for his statement that Defendant's actions are "suspect." Therefore, reliance on it is insufficient to satisfy Plaintiff's burden of production regarding evidence of pretext. Johnson's statement simply fails to place Defendant's justifications in controversy.[17]

2. Matala's Consideration of Management Control Program Experience is Insufficient Evidence of Pretext

---

[17]In any event, both litigants are entitled to *de novo* review of the agency decision in federal court. *See, e.g.*, *Ellis v. England*, 432 F.3d 1321, 1323-25 (11th Cir. 2005). The court is not bound by the OCI Investigator's legal conclusions.

Plaintiff argues that Matala's consideration of Management Control Program ("MCP") experience is evidence of pretext.   Plaintiff's argument turns on the fact that the official job description and vacancy announcement do not overtly reference MCP supervision.  Matala testified that, despite the failure to mention explicitly MCP responsibilities in the job description and vacancy announcement, the task was captured in the categories "Team Lead" and "Other Duties as Assigned." (Def. Ex. 5 at 137:6-11; 138:12-13).

According to the vacancy announcement, the Program Analyst is responsible for "[d]esign[ing] and conduct[ing] comprehensive studies where the boundaries are extremely broad and difficult to determine in advance [,] [d]evelop[ing] detailed plans (many without precedent and long-range)[,] and direct[ing] or conduct[ing] comprehensive management studies . . . ." (Def. Ex. 7 at 1).   And as Team Lead, the Program Analyst must "[k]eep[] in touch with the status and progress of work" and "[m]aintain[] a current knowledge and answer[] questions of other employees on procedures, policies, directive, etc."  (Pl. Ex. 6.2).   Moreover, when a job description contains "other duties as assigned," as this one did, the designation is designed to "make[] clear that the assignment of duties to employees is not limited by the content of the position description."  (Pl. Ex. 6.2; Pl. Ex. 37 at 2).   On this record, it is certainly reasonable to conclude that overseeing MCP activity falls within this broad and eclectic catalog of duties.

A survey of the caselaw reveals that "[t]he fact that an employer based its ultimate hiring decision on one or more specific factors encompassed within a broader and more general job description does not itself raise an inference of discrimination sufficient to overcome summary judgment.   Indeed, . . . no previous case from this or any other circuit [has] suggest[ed] that an employee gets past summary judgment simply by showing that a factor in the hiring decision was

not expressly listed in the job description when the factor was encompassed by the job description."
*Jackson v. Gonzales*, 496 F.3d 703, 709 (D.C. Cir. 2007); *see also Lee v. GTE Fla., Inc.*, 226 F.3d
1249, 1255 n.2 (11th Cir. 2000) ("[T]he fact that the employer had changed the importance of the
criteria used in the selection process [did not] establish[] pretext, because the promotion decision
is a dynamic one, and the relative importance placed on various selection criteria cannot be expected
to remain fixed and unyielding.") (citation and internal quotation marks omitted).

And as the Sixth Circuit persuasively explained, "employers are not rigidly bound by the
language in a job description. . . . '[R]easonable employers do not ordinarily limit their evaluation
of applicants to a mechanistic checkoff of qualifications required by the written job descriptions.
Obviously, they will take additional credentials into account, if those credentials would prove useful
in performing the job.'" *Browning v. Dep't of the Army*, 436 F.3d 692, 696-97 (6th Cir. 2006)
(quoting *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1297 n.15 (D.C. Cir. 1998)); *see also Lamb
v. Boeing Co.*, 213 Fed. App'x 175, 180 (4th Cir. 2007) ("But Title VII does not impose the
impracticable obligation of anticipating and recording before the fact a company's valuation of every
credential with which it might be presented, and we cannot sanction the inference that the credentials
upon which the hiring managers said they relied were pretexts merely because they were not listed
in advance.").

Applying these principles here, Plaintiff has failed to produce evidence that overseeing MCP
activity does not fall within the ambit of a Program Analyst's Team Lead responsibilities or other
duties as assigned.  As Plaintiff acknowledges, Matala did not design the job description or the

vacancy announcement.[18]  Rather, Matala prepared the scoring matrices and the interview questions based on her understanding of the position's requirements in conjunction with the official job description.  (Def. Ex. 4 at 1).

In *Courtney v. Biosound, Inc.*, the Seventh Circuit reversed the grant of summary judgment because the employer relied on an allegedly essential job requirement that was not explicitly mentioned in the position's description.  42 F.3d 414, 421 (7th Cir. 1994).  The Seventh Circuit's decision, however, did not solely rely on the exclusion.  *Id.*  Instead, the incumbent testified that, during his employment, he had never performed the allegedly essential yet omitted elements of the position.  *Id.*  It was this evidence – not the general omission – which convinced the court that a genuine issue of material fact existed as to the question of pretext.  In the instant case, on the other hand, the undisputed evidence establishes that East actually has overseen and continues to oversee MCP activity in her capacity as Program Analyst.  (Def. Ex. 5 at 117:13-119:14, 120:16-22).  Thus, unlike *Courtney*, there is no evidence to suggest the irrelevance of the job requirement that Matala deemed critical.  Plaintiff has not identified any evidence that a Program Analyst, at the Redstone Arsenal, is not responsible for overseeing MCP activity.[19]

---

[18]According to Plaintiff, "[t]he position description for this job was prepared by CPOC Classification Office, U.S. Army, Redstone Arsenal, A1.  The Vacancy Announcement was prepared by CPAC, from the aforementioned position description."  (Pl. Opp. Brief at 1) (record citations omitted).

[19]Plaintiff attempts to cast doubt on Matala's testimony by referencing the job description for a Management Analyst.  According to Plaintiff, "Management Control Program is a duty that is non-job related to the Program Analyst, GS-0343-13.  Management Control Program is a job requirement for the position Management Analyst, GS-0343-12, in the LOGSA Support Services Division."  (Pl. Opp. Brief at 13).  Indeed, a Management Analyst is responsible for "[d]irect[ing] and/or facili[tating] the LOGSA Management Control Program (MCP)" and "[e]nsur[ing] guidance is current; task[ing] organizational units to conduct MCP inspections; provid[ing] guidance, consolidat[ing] input and prepar[ing] Annual Assurance Statement for submission to HQ AMC within established suspenses."  (Pl. Ex. 20 at 2).
This evidence misses the mark.  Plaintiff's evidence establishes that a Management Analyst is tasked with front-line MCP responsibilities, whereas Matala testified that East, as Team Lead, *oversees* this function:
Q.      [East] does no actual work on the MCP program?
. . . .

Moreover, the timing of this factor's adoption and consideration eviscerates any inference of improper motive.  Matala forwarded a copy of the matrices and interview questions "to the LOGSA Command Group for approval . . . . Once the Command Group approved the selection criteria, matrix, and interview questions, a Request for Personnel Action was forwarded to [CPAC] to begin the official process of announcing the vacant position."  (Def. Ex. 4 at 1).  In other words, she prepared these documents before receiving any resumes from applicants.  (Def. Ex. 5 at 54:22-55:1).  Accordingly, "[i]t is difficult to hold that a practice which affects applicants of all races in the same manner is actually designed to conceal a racially discriminatory motive."  *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 952 (11th Cir. 1991) (citations omitted).  This observation applies with equal force to Plaintiff's sex discrimination and retaliation claims.  Because all applicants were evaluated based on their MCP experience, a trier of fact could not conclude that Matala considered this factor in a discriminatory or retaliatory manner, especially when it was a factor which decisively separated East from the other top applicants and a job function which East has overseen (and continues to do so).[20]

Indeed, to evince discriminatory or retaliatory animus on this basis, Plaintiff's theory proceeds from four unstated (and unsupported) assumptions: (1) Matala predicted that Plaintiff would apply for the position; (2) Matala knew that overseeing MCP activities was not explicitly

---

A.      Yes.  She reviews Mr. Cain's work.  She makes recommendations on his work.  She gives him input and guidance on any areas that need to be corrected.  She provided feedback to him and assistance on the management control program as needed.

(Def. Ex. 5 at 119:2-14).  Plaintiff's evidence, therefore, does not cast doubt on Matala's representation regarding the Program Analyst's responsibility as Team Lead to *oversee* MCP activity.

[20]East received four points from each panel member as to her MCP experience.  (Def. Ex. 13).  Plaintiff and Clingerman, on the other hand, each received zero points.  (Def. Ex. 13).

mentioned in the job description and vacancy announcement; (3) Matala predicted that a non-black female, who possessed MCP experience, would apply for the position and fortuitously reflect such experience despite the absence of forewarning in the job description; and (4) Matala surmised that someone like Plaintiff would not list skills required for overseeing MCP activities. Although the second assumption may not in itself be altogether unreasonable, the first, third, and fourth have no basis in the Rule 56 record. In this case, to support the conclusion that Defendant has offered pretextual justifications would require the trier of fact to either engage in untethered speculation or conclude that Matala is clairvoyant.[21]

Furthermore, of the eighteen candidates, for Task Two (*i.e.*, MCP experience), three (including East) received four points; one received three points; one received one point; and the remaining thirteen (including Plaintiff and Clingerman, the other top contender) received zero points. (Def. Ex. 13). The fact that other applicants reflected their MCP experience despite the job description's overt silence also undercuts Plaintiff's suggestion that Matala incorporated the factor

---

[21] Plaintiff, without elaboration, launches similar attacks against Matala for preferring East's experience with the Table of Distribution Allowances ("TDA"), Concept Plans, and Interservice Support Agreements: "The vacancy announcement did not list TDA for this job. The same argument is made about TDA that is made for MCP . . . . Concept plans and Intervservice Support Agreements: Neither of these are [sic] listed in the job description nor listed in the job vacancy yet, all are found in East's resume and all are cited as reasons for her promotion." (Pl. Opp. Brief at 30-31) (record citations omitted). For the same reasons detailed above, Matala's consideration of East's experience with these matters is just as reasonable as her consideration of East's experience with MCP activity.

Specifically, as Defendant argues, "Plaintiff is incorrect in asserting that MCP, TDA, Concept Plans, and Interservice Support Agreements are non-job related criteria as the vacancy announcement for this selection specifically speaks to the wide range of studies and plans the successful applicant must develop and oversee." (Def. Reply Brief at 37-38). Aside from the generic job description and vacancy announcement, fatally, Plaintiff has produced no evidence demonstrating that the Program Analyst, as a practical matter, is uninvolved in these areas. *See Alexander v. Chattahoochee Valley Cmty. Coll.*, 325 F. Supp. 2d 1274, 1284 (M.D. Ala. 2004) (finding that a hiring decision based on a job duty not included in the written qualifications for the job did not show pretext when the plaintiff did not produce any evidence that the duty was not, in fact, done by the person selected for the position).

to discriminate or retaliate against him.[22]  The court, therefore, is unable to conclude that Plaintiff

has identified a genuine issue of material fact as to pretext insofar as Matala considered and weighted

the candidates' MCP experience.

Finally, the undisputed evidence indicates that, to the extent that Plaintiff has had actual

experience in the MCP context, he acquired such experience *after* the promotion in question.  (Def.

Ex. 5 at 129:18-21).  Plaintiff responds that he had underlying, or "desirable," skills that translate.

(Pl. Opp. Brief at 29).  Regarding this point, Matala agreed that, *if* Plaintiff had identified these

transferrable skills in his resume (or otherwise brought them to her attention), then the panel possibly

would have awarded him anywhere between one and three points.  (Def. Ex. 5 at 136:2-13; 282:13-

20).  But she further testified that she "did not see in [Plaintiff's] resume where he talked about

components of the management control program, which includes training the managers, getting

feeder statements, consolidating the report, all that is part of a management control program."  (Def.

Ex. 5 at 135:10-16).  In any event, it is not unreasonable for an employer to prefer actual instead of

transferrable experience.  Importantly, no evidence suggests that Matala's decision would have been

different if she had given consideration to transferrable skills that Plaintiff now says he should have

received.  *See, e.g.*, *Gremillion v. Walgreen Co.*, No. 05-484, 2006 U.S. Dist. LEXIS 44192, at *27

(M.D. Ala. June 28, 2006) ("Merely because Plaintiff might evaluate his experience more favorably

is irrelevant.  An employer retains the prerogative to evaluate experience and prefer more and

---

[22]This fact also substantiates the wise application practice of reflecting all relevant or potentially relevant work
experience and skill in a resume:

      Q.      Can you explain how [an applicant] would know to put management
               control program into his or her resume if it is not listed in the vacancy?
      A.      Their resume should reflect all experience they have.

(Def. Ex. 5 at 124:15-20).

35

comparable experience to less, absent a showing that the process is a sham.") (quoting *Farrokhi v. Laura Ashley, Inc.*, 82 F. Supp. 2d 1248, 1252 (D.N.M. 1999)).[23]

       3.     <u>Matala's Consideration of Applicant's Examples is Insufficient Evidence of Pretext</u>

Plaintiff also claims that Matala improperly considered the presence (or absence) of examples in the resumes of the final three candidates. (Pl. Opp. Brief at 27-28, 33). The court concludes that in light of the undisputed evidence in this case, in context, Matala's decision to promote East over Plaintiff and Clingerman based, in part, on examples in East's resume is a reasonable basis for an employment decision. An example merely concretizes the specific duties and skills listed in a resume, and it is certainly reasonable for an employer to favor resumes replete with specificity over resumes that simply parrot official job descriptions, of which the hiring official would already be well aware. *See Combs*, 106 F.3d at 1543 ("[A] plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer.").

In response, Plaintiff argues that Matala transformed an optional resume feature[24] into a *de facto* requirement. This contention borders on the absurd. Matala did not favor East's resume

---

[23]Plaintiff raises a similar contention regarding his training as compared to East. (Pl. Opp. Brief at 16). According to Plaintiff, East "has attended 15 training courses in her career. [Plaintiff] has attended 27 training courses in his career, including, Personnel, Manpower, Supervisory and Leadership." (Pl. Opp. Brief at 16) (record citations omitted). First, Plaintiff has offered neither evidence nor argument establishing the relevance of his specific training courses to the Program Analyst position. Second, to the extent that the courses were relevant, both he and East received maximum credit according to the score matrices. (Def. Ex. 12). Third, and closely related, when a plaintiff "points to no evidence other than [his] own subjective belief that [a] factor should have guided the company's decision," pretext is not demonstrated. *King v. ADT Security Servs.*, No. 06-519, 2007 U.S. Dist. LEXIS 68628, at *68 (S.D. Ala. Sept. 17, 2007). Finally, the undisputed evidence indicates that Matala made her hiring decision on the basis of experience, as opposed to mere training, which would certainly motivate a reasonable employer. (Def. Ex. 5 at 132:1-10).

[24]Matala testified that examples are "not required in the resume." (Def. Ex. 5 at 143:16-21). But the examples were nevertheless beneficial because Matala "could see clearly the experience [East] had. She cited specific examples with studies she had conducted." (Def. Ex. 5 at 144:6-9).

because of examples unrelated to specific job requirements – the examples in question illustrated

her skills and experience regarding tasks germane to the Program Analyst position.  In other words,

Matala's preference for examples operated alongside her review for core occupational competencies.

All considerations being equal, therefore, Matala's preference for a resume that explicitly illustrated

job-related activities is a reasonable, business-related justification that does not smack of unlawful

discrimination or retaliation.

Plaintiff relies on the Resume Builder[25] instructions to minimize the impact of his failure to

cite examples of his experience.  The Resume Builder's instructions include the following guidance

for the "Description of Duties" field:

> Enter a brief description of your position's duties.  Include in your
> description any systems you have worked on; any software programs
> you have used; any special programs you have managed; any
> regulations, directives, etc. you have used; *any other job-related
> information you would like to include.*

(Pl. Ex. 18 at 3) (emphasis added).  The Resume Builder instructions, however, are sufficiently broad

so as not to proscribe or deter the inclusion of examples.  Contrary to Plaintiff's suggestion, it is

unreasonable to infer from these instructions that examples are disfavored, irrelevant, or forbidden.

Defendant accurately observes the dynamic at play: "When choosing the best qualified candidate for

a vacancy, any reasonable selecting official who is confronted with a choice between a resume that

merely lists general duties of the positions held (as exemplified by [Plaintiff's] resume) and a resume

that lists job responsibilities and experience by articulating specific examples of the applicant's

experience (as exemplified by [East's] resume), would choose the resume with concrete examples

of experience."  (Def. Reply Brief at 36).

---

[25]The candidates were required to use this program to submit their application materials.  (Pl. Ex. 17 at 1).

4.      Matala's Reliance on Averaged Scores is Insufficient Evidence of Pretext

In light of Matala's statement that the scores were "statistically insignificant," Plaintiff attempts to widen the gap between his score and East's score in an effort to show pretext. Specifically, Plaintiff contends that Matala improperly averaged the scores instead of summing them, which resulted in a minimized disparity between the scores. (Pl. Opp. Brief at 32-33). Plaintiff bases his argument on Defendant's policy concerning panel evaluations: "No averaging of scores. Each [panel] member's scores will be entered on a spreadsheet and the total points recorded."[26] (Pl. Ex. 10). Defendant, attempting to deflect this concern, contends that the panel – as opposed to Matala – averaged the scores: "The record is clear that, to the extent that any scores were averaged, they were done by the panel members and panel chair, Mr. Jimenez, not Ms. Matala." (Def. Reply Brief at 40-41).

Defendant's argument is off the mark.   It is undisputed that Matala engaged in the independent review of the panel's tabulation because the spread among the finalists' scores was negligible. (Def. Ex. 15).  Matala later clarified that a "statistically insignificant" difference among candidates is between zero and five points.  (Def. Ex. 5 at 183:12-184:8).  Accordingly, only if Matala relied on the averaged scores – as opposed to the summed scores – could she have reached that conclusion about statistical insignificance.  In short, although Matala did not formally average

---

[26]This policy is reflected in Defendant's Selection Guidance Checklist.  (Pl. Ex. 7).  There is a dispute as to whether, during the events giving rise to this lawsuit, the document existed.  During the deposition of Matala, she testified that it had been operative at the time of the application and decision-making processes. (Def. Ex. 5 at 50:14-19).  Matala later recanted and stated, because of her confusion over the questions, that she was mistaken.  (Def. Ex. 4 at 2).  In fact, according to Matala's clarification, the document became official approximately one year after the promotion in question. (Def. Ex. 4 at 2-3).  The court must view the evidence in the light most favorable to Plaintiff; therefore, the court assumes without deciding that the document was in effect at the time of the decision.

the scores, she relied on them, which amounted to adopting the methodology employed by the panel.[27]

But while Plaintiff is correct in noting this fact, it is of no help to him here. If the scores had not been averaged, Plaintiff claims, then his lead over East would have been four and a half points. (Pl. Opp. Brief at 37). Matala would still have engaged in the same independent review that she conducted in this case because the spread was less than five points.[28] (Def. Ex. 5 at 183:12-184:8). In other words, even if Matala had adhered to Defendant's policy, she would have reached the same conclusion and selected East over Plaintiff. *See, e.g.*, *Truss v. Harvey*, 179 Fed. App'x 583, 588 (11th Cir. 2006) (concluding that incorrectly calculating matrix scores is an insufficient basis for establishing pretext when the error is not outcome determinative). In the Eleventh Circuit, "[d]epartures from normal procedures may be suggestive of discrimination." *Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985). But "[s]tanding alone, deviation from a company policy does not demonstrate discriminatory animus." *Mitchell v. USBI Co.*, 186 F.3d 1352, 1355-56 (11th Cir. 1999) (citing *Berg v. Fla. Dep't of Labor & Employment Sec.*, 163 F.3d 1251, 1255 (11th Cir. 1998); *EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1182 (5th Cir. 1996); *Friedel v. City of Madison*,

---

[27] The court pauses to observe that perhaps neither party's representation of the facts is accurate. According to the Selection Guidance Checklist, which for the benefit of Plaintiff the court assumes to have been in effect, the *panel members* are instructed not to average scores. (Pl. Ex. 10). This document, upon which Plaintiff's argument relies, does not state that the selection official (*i.e.*, Matala) is forbidden from averaging the scores. (Pl. Ex. 10). Thus, even if the panel members deviated from the policy and averaged the scores, Matala was free to average them in order to assist with her final determination. The panel's deviation, therefore, amounted to harmless error, as Matala relied on a methodology that the underlying policy authorized *her* to use.

[28] Plaintiff continuously relies on Matala's testimony that closer inspection is required when the applicants' scores are within five points of one another. Importantly, Matala testified that she would scrutinize the top scoring applicants further if their scores were within five points. (Def. Ex. 5 at 83:22-85:4). She so testified not in isolation but in the context of *this particular* consolidated score matrix. (Def. Ex. 5 at 83:22-85:4). Matala has not stated the window of further evaluation when the scores are not consolidated (*i.e.*, when interview scores are reflected absolutely instead of averaged). Defendant has not raised this concern; accordingly, the court assumes without deciding the accuracy of Plaintiff's expansive and non-contextual interpretation of the testimony.

832 F.2d 965, 973 (7th Cir. 1987)).  Consequently, mere reliance on averaged instead of summed

scores does not suggest any pretext or discriminatory or retaliatory animus here.

     5.      <u>Plaintiff's Attempts at Recalculating the Scores are Unavailing</u>

     In any event, Plaintiff attempts to further maximize the disparity between his score and East's

score, and therefore exceed the five-point threshold, by contending that the panel inaccurately

assigned East three points for education.  (Pl. Opp. Brief at 37).  To reach this conclusion, Plaintiff

contorts the language in East's resume.  Specifically, her resume contains the following entry under

the heading "Education:"

> Bachelor's Degree None, N/A, Business Administration, GPA 3.0,
> Florida Institute of Technology, Total Credit hours earned semester;
> 3, BA, 1971, Business, GPA 2.66, Mississippi State University, Total
> Credit hours earned semester; 74, AA, 1967, Business, GPA 2.67,
> Northeast Mississippi Community College, Total Credit hours earned
> semester; 66, 1965, Belmont High School.

(Def. Ex. 17 at 2).  In Plaintiff's brief, he asserts that East "wrote down in her resume that she had

no college degree.  This is what she wrote: 'Bachelor's Degree None.'"  (Pl. Opp. Brief at 17).  In

context, however, it is readily apparent that East did not obtain a bachelor's degree *from Florida

Institute of Technology*, but she did obtain such a degree *from Mississippi State University*.

According to the Selection Criteria, East correctly received three points from the panel.  (Pl. Ex. 9).

     Similarly, Plaintiff claims that East "was given 1 extra point for an award that that [sic]

carried no points . . . ."  (Pl. Opp. Brief at 37).  Plaintiff clarifies: "East received a 'special act award,

August 2002.['] The resume does not show that it was, according to the Selection Criteria, an annual

related performance or honorary award with cash."  (Pl. Opp. Brief at 37 n.2).  Plaintiff's concern

is merely a distraction.  According to the Selection Criteria, points are assigned under the Awards

category based on the number of "annual related performance or honorary awards over [the] last 5 years." (Pl. Ex. 9). The Selection Criteria do not require a cash award in addition to recognition. (Pl. Ex. 9). Moreover, the Rule 56 record does not reveal that this award was non-annual. Thus, East's Special Act Award within five years prior to the promotion decision qualified, and the panel correctly awarded her one point.

On a related note, Plaintiff asserts that Matala violated Defendant's policy by discounting the relative weight of the Awards category. According to the Selection Guidance Checklist, the panel members, when reviewing applicants' resumes, are to "[r]ate only what is in the resume." (Pl. Ex. 10). Members were provided further instruction: "If you know a person and think something was left out, you can't fill in the blanks."[29] (Pl. Ex. 10). According to Matala, the fact that Plaintiff outscored East in terms of Awards was not significant because "depending on budget constraints, some organization[s] may not be able to give awards as liberally as other organizations." (Def. Ex. 5 at 225:19-23). Plaintiff contends that "East's resume didn't state she [sic] anything about budget cuts. Matala went outside the resume." (Pl. Opp. Brief at 33). First, the Selection Guidance Checklist, insofar as it confines review to the resume, is aimed at the panel members – not the selection official, such as Matala. Second, Plaintiff has not disputed the utility of Matala's basis; indeed, her suggestion is reasonable and grounded in her experience. The court is unable to conclude that a reasonable trier of fact could infer pretext from this statement; indeed, "[a]n employer . . . is

---

[29] As an aside, the court notes that Plaintiff wants to eat his cake and have it, too. That is, he suggests, when beneficial to him, that Matala should have considered factors outside his resume. For example, he argues that he "knew the components of [the MCP job and Matala was supposed to have seen [the fact that he received zero points] as an anommomly [sic]. She did not. That is impossible." (Pl. Opp. Brief at 29) (record citations omitted). Apparently, Plaintiff contends that an unfavorable result from weighing external factors is a violation of policy, but a result favorable to him comports with good decision-making.

free to prefer one job attribute over another . . . ."  *Givens v. Chambers*, 548 F. Supp. 2d 1259, 1273 (M.D. Ala. 2008).

Plaintiff further quarrels with Defendant's business judgment insofar as Matala preferred East's civilian supervisory experience over Plaintiff's military experience.  (Pl. Opp. Brief at 24).  In particular, Plaintiff argues that "Matala saying that military experience cannot contribute to Team Lead skills for civilian personnel work at Redstone Arsenal Military base, without more, is vague and subjective."  (Pl. Opp. Brief at 24-25).  Matala testified that civilian personnel experience coincided with the Program Analyst's duties insofar as the position primarily supported civilian personnel.  (Def. Ex. 5 at 156:7-22).  The summary judgment record shows that Matala recognized both civilian and military experience as valuable, but given the work force primarily serviced, she tipped the scale toward East and away from Plaintiff.  (Def. Ex. 5 at 158:7-10).

Plaintiff replies that military experience is more valuable than civilian experience because "LOGSA is a military job on a military base.  Their ultimate supervisor is the LOGSA Activity Commander, Colonel Commanding[.]  As part of the job, East would have to, if asked, counsel with the commander."  (Pl. Opp. Brief at 25).  In support of this argument, Plaintiff cites only to the following testimony from Matala:

> Q.     Does Ms. East serve as a technical consultant to the commander in any capacity?
>                         . . . .
> A.     She answers to the director – I mean to the commander if he has questions.

(Def. Ex. 5 at 180:9-23).  But it is simply unreasonable to extrapolate, from this limited exchange, the proposition that East must engage in military-level planning, although she would serve in an exclusively civilian capacity.  The more reasonable understanding of Matala's answer is that East

would answer to the Commander regarding questions concerning the position of Program Analyst, which involves primarily civilian personnel support.  In sum, Plaintiff has not demonstrated that Defendant's preference for civilian personnel experience is unreasonable under the circumstances.

Purporting to cast doubt on Matala's statement, Plaintiff cites to LOGSA's Organization and Functions Manual.  (Pl. Opp. Brief at 26).  The Manual states that LOGSA's mission is to "[d]eliver relevant logistics solutions through focused analysis to joint forces, commanders, users, maintainers, developers and managers of current and future combat systems for timely and decisive action."  (Pl. Ex. 31 at 2).  Additionally, LOGSA is responsible for "[m]onitor[ing] and control[ling] all civilian and military personnel actions."  (Pl. Ex. 31 at 4).  This Manual, however, is dated March 2006 – that is, nearly one year after the events precipitating this litigation.  In any event, assuming a similar document with similar language was in play at the time of the promotion decision, Plaintiff has not produced any evidence to suggest that the macro-level goals and tasks of the *entire* organization necessarily mirror the micro-level responsibilities associated with a particular position, such as Program Analyst.  Indeed, the undisputed evidence is that this particular job services primarily (and oversees exclusively) civilian personnel, and this fact supports Matala's expressed preference for civilian supervisory experience.  (Def. Ex. 5 at 156:7-22).  Plaintiff has not identified any contrary

evidence.[30]   At bottom, based on the evidence, it is reasonable for the *civilian* wing of a military operation to place a premium on *civilian* experience.

Additionally, Plaintiff suggests that Matala deviated from protocol by failing to obtain Manley's signature and approval of the score matrices.  (Pl. Opp. Brief at 34).   According to Regulation 690-1, which governs competitive merit promotions, the reviewing official, in this case Manley, must pre-approve and sign both the selection matrix and the interview questions before the hiring process.  (Pl. Ex. 5 at 7).  In response, Defendant counters that "any failure by the selecting official [Matala] and the reviewer [Manley] to sign the document is, at best, an administrative oversight."  (Def. Reply Brief at 42).

More saliently, "Plaintiff has offered no evidence that the required reviews were not performed."  (Def. Reply Brief at 43).  In fact, the undisputed evidence establishes that Matala obtained approval of the matrices and interview questions prior to the vacancy announcement.  (Def. Ex. 4 at 1).  At bottom, therefore, Plaintiff's concern is that Manley failed to sign the document.  A failure to sign amounts to a minor policy deviation – one that Plaintiff has not suggested to have prejudiced his opportunity to obtain the promotion.  Significantly, Plaintiff has not demonstrated that Matala's deviation edged other applicants ahead of him because of his race or sex, or because he engaged in protected activity.  *See, e.g.*, *Rojas v. Florida*, 285 F.3d 1339, 1344 n.4 (11th Cir. 2002)

---

[30]As discussed above, Matala partially favored East's leadership experience over Plaintiff's leadership experience because of comparative duration.   In response to this claim, Plaintiff produced an affidavit, in which he attests to having nearly thirty years of military leadership experience.  (Pl. Ex. 30).   Problematically, however, this information was not included in his resume, which Matala and the panel reviewed in order to determine the qualified applicants and the eventual selectee.  (Def. Ex. 16).   Instead, his resume, as submitted, indicated that he had served in a military leadership capacity since 2001 (*i.e.*, approximately four years at the time of the decision).  (Def. Ex. 16 at 4).   Accordingly, Plaintiff has not produced evidence to suggest that Matala would have or even should have been aware of his nearly thirty years of military leadership at the time of the promotion in question.  Matala's preference for East over Plaintiff was grounded in the facts as presented to her.

44

("To establish pretext, a plaintiff must show that the deviation from policy occurred in a discriminatory manner.") (citation omitted). Accordingly, the signature defect neither (1) suggests the non-discriminatory and non-retaliatory reasons to be false nor (2) hints at discriminatory or retaliatory motivation.

Finally, Plaintiff assigns pretext in Matala's failure to "keep a hard copy" of her job analysis. (Pl. Opp. Brief at 32). Plaintiff bases this argument on Regulation 690-1, which requires the selection official "[u]sing job duties and responsibilities[,] to determine the required and desired skill requirements of the job to be used in the job evaluation process." (Pl. Ex. 5). Regulation 690-1, however, does not require the selecting official to maintain a hard copy of the job analysis. Moreover, the undisputed evidence establishes that Matala actually performed the requisite job analysis. (Def. Ex. 5 at 45:15-19). As Defendant concludes, "[i]t is disingenuous, at best, for [Plaintiff] to allege pretext based upon a failure to follow a selection policy, when there is no requirement to do what Plaintiff asserts." (Def. Reply Brief at 38).

6.       Plaintiff Has Not Identified Any Suspicious Inconsistencies

As a general matter, "the identification of inconsistencies in the defendant's testimony is evidence of pretext." *Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir. 1994). In this case, however, Plaintiff has not demonstrated that Matala has taken fatally inconsistent positions. First, on May 19, 2005, Matala prepared and submitted two separate documents. In the first, a Referral List Candidate Selection, prepared for CPAC, Matala summarily stated that she selected East "based on qualified panel members['] rating of identified tasks and interviews." (Pl. Ex. 11). In the second, a Memorandum for Record submitted to the Chief of the Enterprise Integration Center, Matala stated that she selected East "from the panel['s] determined group of 'best qualified' applicants based on

45

my evaluation of the strength[s] and weaknesses . . . ."  (Def. Ex. 15).  From these statements, Plaintiff claims that the documents "contain opposite reasons for [Matala's] choice of East."  (Pl. Opp. Brief at 34).  The court is simply unable to discern a tension, let alone an "opposite reason," when comparing these two statements.  At best, the former document, unlike the latter, suggests that Matala wholly deferred to the panel's decision.  That interpretation, however, is more than overly ambitious.  The former document states that Matala made the selection "based on" the ratings and interviews, and the latter states that Matala did the same (although the latter document contained substantially more context than the former).  Thus, to the extent that the documents are in tension, "[w]hile it is true that *substantial changes over time* in the employer's proffered reason for its employment decision support a finding of pretext, this does not mean that an employer cannot elaborate on its proffered reason."  *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 855 (8th Cir. 2005) (citation omitted) (emphasis added).  Accordingly, Plaintiff's suggestion that Matala has taken a suspiciously contrary position is unfounded.

Similarly, the parties devote significant attention to whether Matala perceived East to be black and, relatedly, whether Matala's position changed during the course of the pre-litigation investigation vis-a-vis her statements during discovery in this case.  Plaintiff contends that "Matala changed her position that East was black to East was white," and that this shift creates an inference of pretext.  (Pl. Opp. Brief at 35).  The Rule 56 evidence, however, reveals a more innocent explanation for the seemingly inconsistent positions.

In January 2006, and in response to the OCI investigation, Matala produced a document, prepared after the selection date, which identified the race and sex of each of the three top candidates (*i.e.*, Plaintiff, East, and Clingerman).  (Pl. Ex. 2; Def. Ex. 5 at 193:18-20).  The document classified

East as being black.  (Pl. Ex. 2).  According to Matala, she designated East's race based on a file provided to her and prepared by CPAC.  (Def. Ex. 5 at 183:1-7).  Consequently, when Matala testified during the OCI investigation that East was black, she based this representation on the same document.  (Def. Ex. 5 at 187:22-188:2, 188:15-23).  Furthermore, during this investigation, Agency Attorney Walter Baker contacted East regarding her race.  (Pl. Ex. 3).  East informed Attorney Baker that she is white and the "information in the personnel data base was in error due to [her] confusion over the codes assigned to the different racial categories."  (Pl. Ex. 3).  Finally, Matala testified, incident to this litigation, that "[v]isibly, I would say [East is] White, but I do not know her heritage." (Def. Ex. 5 at 187:12-14).

Matala's later statement is consistent with her prior understanding and does not suggest a suspiciously shifting position.  Critically, the undisputed evidence reveals that Matala based her representation on a personnel file classification, and Plaintiff does not argue (nor is there anything at all to suggest) that Matala improperly altered the document.  The record, even when viewed in the light most favorable to Plaintiff, merely suggests that Matala innocently relied on a file with an error and opted not to make a swift, superficial judgment about another's race.  At bottom, the record does not suggest that Matala nefariously concealed East's actual race.

In any event, the cases have never suggested that *any* inconsistency is evidence of pretext; rather, the inconsistency must cast doubt on the employer's stated justification for taking the disputed employment action.  *See, e.g.*, *Combs*, 106 F.3d at 1538; *see also Nasti v. CIBA Speciality Chems.*, 492 F.3d 589, 593 (5th Cir. 2007) ("[P]retext [may be inferred] where a defendant has provided inconsistent or conflicting explanations for its conduct.") (citation omitted).  Here, Plaintiff has not linked Matala's post-promotion representations regarding East's race to the recorded bases

for promoting East over Plaintiff or Clingerman.  An ancillary inconsistency, wholly divorced from the employment decision, is not evidence of pretext.

Finally, Plaintiff asserts that Matala's position shifted regarding the role of the panel in promotion decisions.  According to Matala, "[w]hen panels are set up . . . [the selecting official] does not have to choose the first, second, third person . . . .  [B]ut when [the selecting official does not], [he or she has] got to give a mighty good reason why [he or she] did not choose the number one person when [he or she] got a panel together, gave them instructions to follow on how to select and what [to] look[] for . . . ."  (Def. Ex. 5 at 14:22-15:6).  Plaintiff, however, has not produced any evidence elucidating the "mighty good reason" standard or whether this employment decision indeed amounted to a "mighty good reason."  In fact, Matala subsequently testified that her reasons for selecting East over Plaintiff and Clingerman constituted "mighty good reasons," at least from her perspective and as endorsed by Manley.  (Def. Ex. 5 at 256:4-7; Def. Ex. 15).

Furthermore, the undisputed evidence reveals that Matala, during her tenure as a selecting official, never had dealt with applicants whose scores were as close as these.  (Def. Ex. 5 at 83:22-84:3).  Accordingly, to the extent that Matala had deferred to the panel's scoring in the past, this case presented a historically unaccounted for scenario, which reasonably explains her divergence from past practice and does not raise the specter of pretext.  If Plaintiff had produced evidence establishing that Matala, when confronted with statistically insignificant score disparities in the past, deferred to the panel's ranking, a triable issue of fact may be present.[31]  Plaintiff's summary judgment arguments

---

[31] The only evidence in the Rule 56 record that touches on this issue is the score matrix used to rank applicants for the temporary Program Analyst position, for which Defendant selected Goff instead of four other applicants, including Plaintiff.  (Pl. Ex. 21).  For that hiring decision, Matala selected Goff, who outscored the second ranked applicant by *sixteen* points.  (Pl. Ex. 21).

48

and evidence, however, fail to account for the unprecedented situation presented to Matala and, accordingly, fail to address head on Defendant's legitimate, non-discriminatory and non-retaliatory reasons.  *See, e.g.*, *Wilson*, 376 F.3d at 1088 ("If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.").

> 7.   Conclusion

Here, the court readily concludes that Matala's proffered reasons – East's superior qualifications and experience – were legitimate and non-discriminatory in nature.  Thus, the burden shifted to Plaintiff to "meet [the proffered] reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).  A plaintiff must show that the disparities between the successful applicant's and his own qualifications were "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff."  *Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004) (citation omitted), *cert. denied*, 546 U.S. 960 (2005); *see also Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006) (per curiam) (approving of this language from *Cooper*).

On this record, Plaintiff has not met his burden under *Cooper* to show that the disparities between his qualifications and those of East were so severe that no reasonable person could have chosen East over him.  Indeed, Plaintiff has offered no evidence to challenge Matala's evidence that East was hired based on her experience and qualifications.  And the court's inquiry in the analysis of a promotion discrimination claim is not concerned with Plaintiff's belief that he was equally or more qualified or whether the court could conclude that East was better qualified than Plaintiff.  *See Cooper*, 390 F.3d at 744 (noting plaintiff's reliance on her own belief that she was better qualified

than promotee and observing that "whether we could conclude [the plaintiff] was better qualified than [the promotee] is not the issue here").

In sum, Plaintiff's purported evidence of pretext falls short of the mark.  Indeed, as Defendant astutely observes:

> Plaintiff cannot establish that [Matala's] selection justification was pretext by scouring the resumes and substituting the areas of considerations that he subjectively feels he is superior to [East] and then assert that the selection should have been made based upon those criteria, instead of the criteria use by the selecting official.  In a further attempt to substitute his judgment for the selecting official's business judgment, [Plaintiff] engages in a disjunctive, subjective re-evaluation of the applicants' resumes in an attempt to claim that the difference in the scores between the top three applicants was statistically significant.  Plaintiff appears to allege that if the interview scores are not averaged, and each area is graded as he thinks they should be graded (and certain categories that all applicants were graded upon, but in which he scored poorly, should be disregarded all together [sic]), then the gap between the applicant is a lot greater than 5 points.  This is exactly the infringement upon the agency's business judgment and the quibbling that is prohibited by *Chapman* [*v. AI Transport*, 229 F.3d 1012 (11th Cir. 2000)].

(Def. Reply Brief at 31, 31 n.6) (record citations omitted).

Understandably, Plaintiff has a high view of his own qualifications and argues that he was more qualified than East.  But "[t]he inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance."  *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) (citing *Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir.1995); *Billet v. CIGNA Corp.*, 940 F.2d 812, 818-22 (3d Cir.1991); *Gray v. Univ. of Ark. at Fayetteville*, 883 F.2d 1394, 1401 (8th Cir.1989); *Weihaupt v. Am. Med. Ass'n*, 874 F.2d 419, 428 (7th Cir.1989); *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir.1980) (perception of decisionmaker, not employee, is relevant)).

50

Plaintiff has essentially invited the court to second guess Matala's business judgment. However, that is exactly what the Eleventh Circuit has repeatedly emphasized a district court is not to do. "Title VII is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business decisions." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1244 (11th Cir. 2001) (citations and internal quotation marks omitted). At best, the record reflects closely matched applicants that Defendant prioritized based on justifications which would motivate a reasonable employer. Reaching any other conclusion would require this court to second-guess the legitimate, non-discriminatory and non-retaliatory reasons offered by Defendant and made with reference to reasonable and clearly documented bases. Thus, because Plaintiff has not established pretext as to the promotion decision in question, summary judgment is due to be granted.

**D.     Plaintiff is Unable to Demonstrate a Causal Relation between His EEO Activity and the Adverse Employment Decision**

"To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events." In this case, Defendant moves for summary judgment on the basis that Plaintiff is unable to shoulder the burden of production as to the causal relation requirement.[32] (Def. Initial Brief at 19-21). Specifically, Defendant argues that "[b]ased upon the significant temporal gap, Plaintiff cannot establish a causal nexus between his prior EEO actions and any alleged retaliatory actions and the Defendant is entitled to summary judgment on these claims as a matter of law." (Def. Initial Brief at 21). Accordingly, the court

---

[32] Indeed, Defendant conceded during discovery that (1) "filing a formal EEO complaint is statutorily protected expression" and (2) Plaintiff "suffered an adverse employment action when he was not promoted to Program Analyst in 2005." (Pl. Ex. 35 at 3).

evaluates only whether the Rule 56 record supports a finding that Plaintiff's statutorily protected expression is causally related to the adverse employment action suffered.

The Eleventh Circuit "has interpreted the causal link requirement broadly; a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *EEOC v. Reichhold Chems., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993) (citation omitted). Nevertheless, as the Eleventh Circuit has repeatedly emphasized, an adverse employment action that protractedly follows protected activity is insufficient, on its own, to create a triable issue of fact. *See, e.g.*, *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact.") (citation omitted). Stated another way, "mere temporal proximity, without more, must be 'very close.'" *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). Absent other substantial evidence, a three- to fourth-month delay between the statutorily protected activity and the adverse employment action is insufficient, as a matter of law, to suggest causation and, therefore, to survive summary judgment. *See Thomas*, 506 F.3d at 1364 (citations omitted). On the other hand, a two-month delay between the adverse employment action and the protected activity may be sufficient to establish a causal relation. *See Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 702 (11th Cir. 1998). In this case, Plaintiff has not produced direct evidence of retaliation and, consequently, relies on a circumstantial inference of retaliation based on the sequence of events. (Def. Ex. 6 at 64:20-22). Accordingly, timing – namely, the statutorily protected expression and the allegedly adverse employment action – is critical to the causation analysis.

But timing alone is insufficient to establish a causal relationship here. Instead, Plaintiff must produce evidence suggesting that, after the decision maker became aware of the protected activity, an adverse employment action closely followed thereafter. *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) ("A plaintiff satisfies this element if [he] provides sufficient evidence of knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse action.") (citation and internal quotation marks omitted). Defendant is a government agency, and in the analogous context of corporate defendants, "knowledge of someone within the corporation may not be imputed to the decisionmaker." *Corbitt v. Home Depot U.S.A., Inc.*, 589 F.3d 1136, 1161 (11th Cir. 2009) (citing *Brungart*, 231 F.3d at 799-800). Instead, "the corporate agent making the [promotion] decision must either have actual knowledge of the protected conduct or be influenced by someone with knowledge." *Id.*

Stated another way, "[s]ince corporate defendants act only through authorized agents, in a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression and acted within the scope of his or her agency when taking the action." *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir.1997). Thus, the critical issue is when Matala (as opposed to someone else within Defendant's organization), who was the undisputed decision maker relevant to this case, acquired actual knowledge of Plaintiff's protected activity.

Defendant argues that December 15, 2004 is the proper starting point for the timing analysis. In particular, Defendant contends that Matala was aware of Plaintiff's informal complaint because she received a Witness Participation in Complaint Processing Memorandum. It is indeed undisputed that Matala received this document on December 15, 2004. (Def. Ex. 18 at 1). The document,

however, does not establish Matala's awareness of Plaintiff's informal complaint.  Specifically, the EEO counselor notified Matala that he "cannot reveal the identity of the aggrieved unless authorized to do so by the aggrieved."  (Def. Ex. 18 at 1).  Moreover, the document does not specify any details other than "[a] complaint of discrimination has been filed against the Department of the Army wherein you have been identified as having knowledge concerning the matters alleged."  (Def. Ex. 18 at 1).  The document does not indicate that Plaintiff had identified Matala as the person responsible for the alleged discrimination.  Consequently, because Defendant has not identified any evidence to suggest that Plaintiff waived the confidentiality or that Matala was otherwise aware that Plaintiff had initiated the informal complaint process, December 15, 2004 is not an appropriate benchmark for assessing temporal proximity.[33]

Plaintiff, on the other hand, is more oblique in identifying when Matala first knew about his EEO complaint.  Plaintiff argues that his "adverse employment action, 5/19/05, occurred a few months after the promotion opened, 2/28/05, which occurred within weeks of EEO's notice to Matala of the formal charge." (Pl. Opp. Brief at 21).  The only date preceding February 28, 2005 that Plaintiff references is February 8, 2005: "[Plaintiff] was given 3 weeks to supply a list of witnesses which he did on February 8, 2005, naming [Matala] as one of the discriminators [sic]." (Pl. Opp. Brief at 9).  Presumably, therefore, Plaintiff identifies February 8, 2005 as the proper point of

---

[33] According to the EEO Counselor's Report, he "advised Ms. Matala of the allegations against her and provided her an opportunity to respond to the charges." (Pl. Ex. 24 at 4).  This document strongly suggests that, despite the anonymity statement in the Witness Participation Memorandum, Matala was likely aware of the nature of the allegations as well as the identity of the complainant prior to Plaintiff filing the formal charge of discrimination.  The document, however, does not specify when the EEO Counselor met with Matala, and the document's date is uncertain.  Technically, the document is dated October 4, 2001 (*i.e.*, several years before the events in question).  (PL. Ex. 24 at 5).  Assuming that the EEO Counselor mistakenly used conventional dating, the document is dated January 10, 2004 (*i.e.*, one year before the events in question).  (Pl. Ex. 24 at 5).  Accordingly, contrary to Defendant's suggestion, the court is unable to conclude that December 15, 2004 is the appropriate date.

reference for the causal relation analysis.  Defendant concurs in this interpretation of Plaintiff's statement: "Plaintiff appears to allege that [Matala] was not aware of [Plaintiff's] protected activity until February 8, 2005, in order to compress the temporal gap between the alleged adverse action and management's knowledge of [Plaintiff's] protected activity."  (Def. Reply Brief at 23).  The court, therefore, assumes without deciding that Plaintiff's proposed date – February 8, 2005 – is the proper starting point.

Second, the parties disagree regarding the date of the adverse employment action.  According to Plaintiff, he suffered the adverse employment action on May 19, 2005.  But Defendant argues that Plaintiff suffered the adverse employment action on July 15, 2005.  The source of dispute is the date contained in Plaintiff's Complaint.  Indeed, in the Complaint, Plaintiff alleged that he "was rejected [for the Program Analyst position] in favor of a white female on July 15, 2005."  (Compl. ¶ 3). Defendant has not identified any evidence corroborating Plaintiff's allegation.  On the other hand, May 19, 2005 was the date that Matala filed a report memorializing her reasons for promoting East over Plaintiff and Clingerman.  (Def. Ex. 15).  Despite Plaintiff's averment, the only *evidence* before the court establishes that the employment decision occurred on May 19, 2005.

Although the general rule is that "[a] plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment," *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (citation omitted), this is not a case where that rule precludes Plaintiff from establishing for Rule 56 purposes that May 19, 2005 was the date of the decision at issue.  The *Gilmour* approach applies when a litigant attempts to propose a new theory of recovery – not when a litigant attempts to prove an underlying fact.  As such, this case presents a different issue altogether: namely, whether a litigant, who has not moved to amend his complaint, is wed to a date

alleged in the pleading despite the uncontroverted evidence produced during discovery, which clearly

demonstrates that another date is correct.  The Southern District of Georgia's analysis of this issue

is instructive:

> Although it is better practice for a plaintiff to move to amend his
> complaint under Rule 15(a) when the evidence developed during
> discovery does not conform to the pleadings, the Court has the
> authority to amend the pleadings under Rule 15(b) where such an
> amendment is not offered.  The Court is empowered to do so to avoid
> the "tyranny of formalism" that prevailed before the advent of the
> Federal Rules in 1938. . . . It is appropriate for the Court to apply
> Rule 15(b) in connection with a pretrial motion.  The Court may
> apply Rule 15 to correct facts that were misstated in the pleadings.
> Such an amendment is proper where there is no showing of prejudice
> by the opposing party.

*Muhs v. River Rats, Inc.*, 586 F. Supp. 2d 1364, 1375-76 (S.D. Ga. 2008) (citations omitted).

The court finds the Southern District of Georgia's approach to be persuasive, as it

appropriately elevates the merits over form.  In this case, Defendant has not argued that it would be

prejudiced by disregarding the pleaded facts in favor of the evidence.  In fact, in Defendant's reply

brief, it argues in the alternative that, even if the date of the adverse employment action is May 19,

2005, Defendant is nevertheless entitled to summary judgment.  Thus, based on the Rule 56 record

and Defendant's failure to show prejudice to the contrary, the court concludes that May 19, 2005 is

the appropriate date for assessing causation.

In sum, to evaluate the causal relation requirement, the following dates are relevant: (1)

Defendant, through Matala, acquired knowledge of Plaintiff's formal EEO complaint on February

8, 2005; and (2) Plaintiff suffered an adverse employment action on May 19, 2005.  Based on these

two dates, more than three months separate the former event from the latter.  Plaintiff has not

proffered any other evidence of retaliation.  Under established Eleventh Circuit law, however, this

is plainly insufficient to create a triable issue of fact, as Plaintiff has identified no other evidence tending to support a causal relation. *See Cooper*, 506 F.3d at 1364 ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough.") (citation omitted); *see also Coar v. Pemco Aeroplex, Inc.*, No. 09-12615, 2010 U.S. App. LEXIS 4043, at *9 (11th Cir. Feb. 25, 2010) ("We have held that even a three-month period between protected activity and an adverse employment action, standing alone, 'does not allow a reasonable inference of a causal relationship between the protected expression and the adverse action.'") (quoting *Higdon*, 393 F.3d at 1221). Consequently, Defendant's motion for summary judgment is due to be granted because Plaintiff is unable to make out a *prima facie* case of retaliation.

In any event, Defendant has articulated legitimate, non-retaliatory reasons for its decision to select East instead of Plaintiff and Clingerman. *See* discussion *supra* Part III.B. In a Title VII retaliation case, once the employer provides a legitimate, non-retaliatory reason for its decision, the inference of retaliation is extinguished, and the burden shifts to the employee to produce evidence of pretext. *See, e.g.*, *Holifield*, 115 F.3d at 1566 (citations omitted). But as analyzed above, Plaintiff has offered no evidence of pretext to rebut Defendant's legitimate, non-retaliatory justifications for its decision. *See* discussion *supra* Part III.C. Accordingly, even if Plaintiff had established a *prima facie* case of Title VII retaliation, his failure to show pretext additionally warrants the entry of summary judgment in favor of Defendant.

## IV.    CONCLUSION

For the reasons set forth, Defendant's motion for summary judgment is due to be granted.

A separate Order consistent with this Memorandum Opinion will be entered contemporaneously

herewith.

**DONE** and **ORDERED** this \_\_\_\_25th\_\_\_\_\_ day of March, 2010.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE